**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| COMMERCE AND INDUSTRY INSURANCE COMPANY,<br><br>Plaintiff,<br>v.<br><br>AUTO PARTS XPRESS, LLC, PARTS DISTRIBUTION XPRESS, INC., PDX NORTH, INC. AND PDX SOUTH, INC.,<br><br>Defendants. | Docket No. 2:16-cv-06263-MSG |

**AFFIDAVIT OF ANTHONY KLONDAR IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

1. I am a senior manager of Parts Distribution Xpress, PDX North Inc., and PDX South, LLC (collectively, "PDX"), and Auto Parts Xpress, LLC ("Auto Parts Xpress"). I handle financial and controller reporting responsibilities for PDX and Auto Parts Xpress, as well as insurance and compliance issues. Consequently, I am familiar with the structure and functioning of PDX and Auto Parts Xpress. I make this affidavit on personal knowledge, and I could and would competently testify to the facts set forth herein if called to do so.

2. I earned a Bachelor of Science in Economics from Pennsylvania State University in 1977. After college, I worked in banking as an officer and senior manager for several regional banks in Philadelphia. I left banking in 1990 to pursue the purchase of an office supply and furniture company.

3. I sold my office supply and furniture company in 1995 and entered the logistics business. That year, I purchased a company called Sir Lancelot Courier & Delivery Service,

an on-demand, expedited courier business. I owned and managed Sir Lancelot until 2005, when Sir Lancelot was purchased by the owner of PDX and Auto Parts Xpress, Frederick Frankel. From that time forward, I took on financial management responsibilities at PDX and Auto Parts Xpress and continued to manage certain operations of Sir Lancelot. Sir Lancelot and PDX are today, and have always been, maintained as separate companies.

**A. Background: PDX and Auto Parts Xpress[1]**

4. Parts Distribution Xpress, Inc. ("PDX Inc.") was formed in 1996 under Pennsylvania law and operates in Pennsylvania and New Jersey.

5. PDX North, Inc. ("PDX North") was formed in 2004 under Pennsylvania law and operates in Massachusetts, New York and New Jersey.

6. PDX South, LLC ("PDX South") was formed in 2008 under Florida law and operates in Florida.

7. Auto Parts Xpress, LLC, was formed in 2011 under New Jersey law and operates in New Jersey.

8. PDX and Auto Parts Xpress are headquartered in Lester (formerly known as Essington), Pennsylvania.

**B. The PDX Business Model**

9. PDX is a transportation broker for auto dealerships, aftermarket wholesale auto parts stores, and national tire companies. PDX works to build and maintain relationships with customers who need delivery services. When those services are needed, PDX arranges for delivery services to be provided by qualified independent contractor drivers ("contract

---

[1] Unless otherwise noted, this Affidavit discusses the general operations of PDX and/or Auto Parts Xpress from 2004 through 2013.

drivers") to those customers and handles the associated finances and billing. PDX does not directly provide transportation services to its customers.

10. When a customer notifies PDX that it needs transportation services from some number of contract drivers, PDX negotiates a flat per-day rate per driver with the customer based on the weight of the load(s) to be delivered and the expected mileage of the job(s).

11. PDX then seeks independent contractor drivers via internet and newspaper advertising or its list of contract drivers in good standing. PDX enters into a contract with the contract driver as an independent contractor and negotiates a per-day rate with the contract driver, based primarily on the weight of the load(s) to be delivered and the expected mileage of the job(s), but also reflective of the fact that PDX obtains the customers and handles billing and collections. The difference between the rates negotiated with the customer and the driver represents PDX's brokerage fee and profit margin (usually about 20%).

12. If a negotiated rate is reached and the contract driver accepts the job, the contract driver then (if not already registered) signs up with a third party administrator service called Contractor Management Services ("CMS"). CMS is completely unrelated to PDX. Now known as Openforce, CMS provided various administrative services to thousands of independent contractors from all across the country.

13. The contract driver then electronically signs three contracts through the CMS online portal: (a) an Independent Contractor Agreement with PDX; (b) an agreement with CMS; and (c) an occupational accident insurance policy that CMS offers through an insurer (e.g., Beacon One Insurance Company). True and correct exemplar copies of these agreements are attached hereto as Exhibits 1, 2, and 3.

14. Occupational accident insurance is similar to workers' compensation insurance, in that it covers medical costs and lost income in the event of injury.

15. Once the contract driver has executed the three agreements, the contract driver then reports not to PDX but to the customer directly to begin delivering auto parts as specified by the customer. Contract drivers never report to PDX during the course of their tasks, and the initial contracting and rate negotiations are conducted by phone, not in person.

16. The customer gives the contract driver a delivery location (which is sometimes referred to as a "route" but is really just a location), and leaves it to the driver to achieve that delivery in accordance with the basic needs of the client and common sense (obeying traffic laws, driving safely, delivering timely). The particular directions or course that is taken to complete the delivery is at the driver's sole discretion, as, generally, are the order of the deliveries. Nor does PDX or the customer control how the auto parts are secured or handled during the delivery. Simply put, the customer determines what result is needed—that is, what needs to be delivered and where—and leaves it to the driver to effect that result.

17. PDX does not maintain daily contact with contract drivers about particular deliveries; the customer may communicate with contract drivers during the job if necessary, but typically the driver simply makes the delivery.

18. PDX's employees perform sales, customer relations, billing and administrative functions. "Key Account Managers" are PDX employees who work in the field, building customer relationships and monitoring the needs of PDX's customers; these persons are listed as "drivers" or "driver operations" in workers' compensation audits. Usually if a driver turns down a job, the job is simply offered to another driver and only in the very unusual circumstance that a contract driver is suddenly unavailable and another contract driver cannot

be located in time will a PDX employee (one of the Key Account Managers) conduct a one-off delivery for a PDX customer. PDX has always paid workers compensation insurance premiums for these employees, and they are not the subject of the present lawsuit.

19. Contract drivers do not prepare timesheets or issue invoices to PDX. Rather, PDX keeps track of the drivers, sites, projects, and days worked, and uses these to bill customers and pay contract drivers. On a weekly basis, PDX multiplies the days (i.e., mornings, afternoons, full days) worked by the negotiated rate to arrive at the amount owed to the driver. PDX pays that amount to CMS, and CMS disburses the money to the driver after deducting CMS membership fees and occupational accident insurance premiums.

20. PDX does not issue paychecks or wire transfers to contract drivers. By contrast, employees of PDX are paid by direct deposit using an employee payroll system.

21. In 2017, the Internal Revenue Service audited PDX North's 2014 tax returns. I was involved in this payroll audit. At issue was whether contract drivers were properly characterized as independent contractors for tax purposes. PDX provided the IRS with copies of its books, records, and documents evidencing contract drivers' relationship with PDX, including the independent contractor agreement. Ultimately, the IRS determined that the contract drivers were properly characterized as independent contractors. As a result, the IRS made "no change" to PDX's tax obligations. Attached hereto as Exhibits 4 and 5 are true and correct copies of letters to PDX North from the IRS communicating the results of the payroll audit.

22. From April 2004 through April 2013, PDX contracted with thousands of contract drivers, probably more than 5,000.

**C. <u>The Independent Contractor Agreement</u>**

23. As previously noted, contract drivers execute a "PDX Independent Contractor Agreement" (the "Independent Contractor Agreement" or the "Agreement") with a verified electronic signature. The Independent Contractor Agreement establishes the scope of the relationship between PDX and contract drivers who will deliver auto parts for PDX customers. Attached hereto as Exhibit 22 is a true and correct copy an executed (with verified e-signature) Independent Contract Agreement of James Coles, dated September 27, 2011, produced by Defendants in this action and bearing Bates numbers PDX0021188 – PDX0021198.

24. In the Independent Contractor Agreement, contract drivers expressly and repeatedly acknowledge their status as independent contractors. First, the Agreement defines the contract driver as "the 'Independent Contractor.'" Ex. 1 at 1. Then, the Independent Contractor acknowledges that he "functions independently and nothing contained in this Agreement shall be interpreted or construed as creating or establishing the relationship of employer and employee between [either] Broker Company [PDX] and Independent Contractor or [the] customers and Independent Contractor." *Id.* ¶ 1. In a subsequent paragraph titled "Independent Contractor Relationship," the Agreement provides that the "Independent Contractor understands, agrees, and acknowledges that the relationship between Independent Contractor and [PDX] is that of an Independent Contractor and not that of an agent, officer, employee or otherwise of [PDX]. . . . Nothing in this Agreement shall be interpreted or construed as establishing a relationship of an employer and employee between Independent Contractor and the Broker Company." *Id.* ¶ 8.

25. In the Independent Contractor Agreement, contract drivers also acknowledge that PDX "will not provide [them] with any health insurance, pension benefits, paid vacation, holidays or sick leave, disability insurance, *workers' compensation insurance*, unemployment

insurance, unemployment compensation, stock options, or any other benefit that may be available to [PDX's] employees from time to time." *Id.* ¶ 9. In practice, PDX never provides the contract drivers with health insurance, life insurance, workers' compensation insurance, a pension, or other benefits, and they are never held out to anyone as employees of PDX. PDX employees, on the other hand, receive vacation and sick days, insurance benefits, and access to a 401(k) retirement savings plan.

26. Pursuant to the Independent Contractor Agreement, contract drivers are responsible for providing, at their sole expense, all the tools and equipment (including appropriate vehicles) needed to complete the referrals that they accept. *Id.* ¶ 3. In practice, contract drivers provide their own vehicles, communications devices, and any tools they see fit to employ to complete assignments. PDX never provides a contract driver with a vehicle, a communication device, or any tools.

27. Pursuant to the Independent Contractor Agreement, neither PDX nor anyone else has any obligation to reimburse contract drivers for any expense they incur in providing their transportation services. *Id.* ¶ 4(c). In practice, neither PDX nor its customers ever reimburse contract drivers for any expenses related to their assignments, whether for fuel, parking, meals, parking tickets, maintenance, vehicle registration, auto insurance or something else; all of these expenses, and any others, are the sole responsibility of contract drivers, who pay all expenses out-of-pocket.

28. In the Independent Contractor Agreement, contract driver agrees that the "Independent Contractor shall, at his sole cost and expense, bear the responsibility for his operations and the performance of his duties as set forth in this Agreement," including " the payment of all federal, state and local taxes, and withholding [social security], unemployment

or worker's compensation payments[.]" *Id.* ¶ 6. In practice, PDX never withholds any taxes on the driver's behalf. At year-end, CMS issues each contract driver an IRS Form 1099 for tax purposes.

29. The Independent Contractor Agreement repeatedly provides that contract drivers have the right to concurrently provide services for multiple companies if they wish to do so. *Id.* ¶¶ 7 ("Independent Contractor reserves the right to provide services for other delivery brokers and/or companies[.]"), 12 ("Independent Contractor . . . may render services of a business, commercial or professional nature to any other person or entity, provided that the rendering of such services does not conflict, either directly or indirectly, with the performance of his servicers or obligations under this Agreement."). In practice, contract drivers routinely provide transportation and delivery services through or to other businesses such as Uber, Lyft, local restaurants, and food delivery services, and to competitors of PDX such as Diligent Delivery Systems.

30. The Independent Contractor Agreement provides that a contract driver is not guaranteed a minimum amount of work or a minimum income or earnings, and the Agreement gives the contract drivers the right to accept or reject job referrals provided to them. *Id.* ¶¶ 7, 11. In practice, contract drivers are paid based on the type of deliveries (i.e., weight of loads and mileage of jobs) and amount of deliveries that they agree to do; the more a contract driver agrees to do, the more the contract driver will make. It is common for contract drivers to turn down delivery jobs offered to them for any reason, including that the contract driver is providing delivery services for another company. Contract drivers are not penalized for turning down referrals when offered them.

31. The Independent Contractor Agreement provides that contract drivers are responsible for the loss or damage of items entrusted to them for delivery. *Id.* ¶ 4(a). When damage to customer goods does occur, they are the responsibility of the contract driver as an independent business person.

32. Pursuant to the Independent Contractor Agreement, PDX may not exercise direction or control over the manner in which the independent contractor completes his or her routes. *Id.* ¶ 10. The contract driver is in complete control of the manner of conducting and completing the delivery assigned to him or her by a PDX customer.

33. PDX does not train its contract drivers in any way, nor does PDX provide contract drivers with instructions on how to load, unload, or secure auto parts.

34. PDX does not control (or even know) when or where contract drivers take rest stops, lunch breaks, perform maintenance on their vehicles, or refuel their vehicles.

35. PDX does not establish set hours when contract drivers must report to or depart from a customer.

36. PDX does not give performance evaluations to contract drivers.

37. Pursuant to the Independent Contractor Agreement, contract drivers are not permitted to use the name of PDX on any business cards, stationary, or other printed material. *Id.* ¶ 17. In practice, contract drivers do not display the PDX name or logo on printed materials or on their vehicles.

38. The Independent Contractor Agreement contains a mutual termination provision pursuant to which the Agreement may be terminated by either party for any reason upon 14 days written notice. *Id.* ¶ 2. Of course, if the contract driver substantially breaches the agreement, then the Agreement can be terminated immediately (but that rarely happens).

**D. <u>The Auto Parts Xpress Business Model</u>**

39. Auto Parts Xpress operates differently from PDX. Auto Parts Xpress uses employee drivers to deliver auto parts for Samuels, Inc. (d/b/a Buy Wise Auto Parts) exclusively.

40. Until 2011, PDX North serviced Samuels along with other customers. Over time, Samuels expressed interest in having an exclusive group of drivers working essentially full time to deliver its auto parts. Samuels also wanted to closely manage and direct the driver's routes and schedules and provide drivers with uniforms, communication devices, and GPS tracking equipment. PDX North acquiesced in these requests with respect to Samuels only. PDX North also had an employee on site at Samuels to help manage the Samuels drivers. (PDX never staffed any PDX employees at any other customer.)

41. The U.S. Department of Labor audited Samuels and PDX North for failure to pay overtime wages to the drivers under the Fair Labor Standards Act. Ultimately, the Department of Labor concluded that the Samuels drivers were jointly employed by Samuels and PDX North. In response, PDX North agreed to pay the back overtime wages and to hire the Samuels drivers as employees. Therefore, Auto Parts Xpress was formed on March 11, 2011 as a separate company to service only Samuels, and all Samuels' drivers were hired as employees of Auto Parts Xpress.

42. Auto Parts Xpress provides communication and tracking devices, uniforms, and expense reimbursements to its drivers, and also provides drivers with specific directions on how to complete their routes. Auto Parts Xpress pays its drivers directly, rather than through a third party administrator, and withholds taxes on the drivers' behalf.

43. Auto Parts Xpress purchased workers' compensation insurance from AIG for the policy years 2011-2012 and 2012-2013. As employees, all of its drivers were included in

the premium basis for both policy years. They were not paid through CMS and therefore are not relevant to the present lawsuit.

44. PDX North continues to connect other customers with contract drivers, separate and apart from Auto Parts Xpress.

**E. The Sir Lancelot Business Model**

45. Sir Lancelot operates differently from PDX. Sir Lancelot is a same-day courier service that dispatches couriers to retrieve and deliver packages on behalf of its customers on demand. Sir Lancelot couriers maintain delivery-to-delivery contact with Sir Lancelot's dispatchers, who communicate with the couriers with via couriers' smart phones. Sometimes, the packages are held on-site at Sir Lancelot's headquarters until delivery can be arranged at a later time or date; therefore, couriers for Sir Lancelot sometimes report to Sir Lancelot in the course of their deliveries. Sir Lancelot drivers are not relevant to this lawsuit, and Sir Lancelot is not a defendant.

**F. The AIG Workers' Compensation Policies Issued to PDX**

46. From April 1, 2004 to April 1, 2011, AIG issued seven workers' compensation policies to some combination of PDX Inc., PDX North, and/or PDX South (the "Prior Policies").

47. From April 1, 2011 through April 1, 2012, AIG issued a workers' compensation policy to PDX Inc., PDX North, and PDX South (the "2011-2012 Policy"). A true and correct copy of the 2011-2012 Policy is attached hereto as Exhibit 6.

48. From April 2012 to April 28, 2013, AIG issued a workers' compensation policy to PDX Inc., PDX North, PDX South, and Auto Parts Xpress (the "2012-2013 Policy"). A true and correct copy of the 2012-2013 Policy is attached hereto as Exhibit 7. I will collectively refer to the 2011-2012 Policy and 2012-2013 Policy as the "At-Issue Policies."

49. Auto Parts Xpress was separately insured by AIG for the 2011-2012 policy period, and all of *Auto Parts Xpress'* drivers, *as employees*, were included in the premium basis for this policy and the 2012-2013 Policy.

50. The Prior Policies and the At-Issue Policies—nine policies in all—contain materially identical terms and provisions, including with respect to the calculation of estimated and audited premiums and the conduct of premium audits.

**G. <u>The Contract Drivers were Excluded from the Premium Basis of the Prior Policies</u>**

51. AIG conducted a premium audit for all seven Prior Policies. The audits were conducted via an on-site visit that included a review of PDX's books and records, the Independent Contractor Agreement, and interviews with PDX employees, including myself.

52. After the audit for the 2004-2005 Prior Policy, contract drivers were not included in the audited premiums because AIG's auditor found that PDX "uses independent owner/operator individuals who are free to work for any one, not under contract with insured, and have no helpers, do not show insured[']s logo on their trucks." A true and correct copy of AIG Workers' Compensation Audit Worksheet for the 2004-2005 Prior Policy, dated May 6, 2005, produced by AIG in this action and bearing Bates numbers C&I 5591 – C&I 5598, is attached hereto as Exhibit 8 (*see* C&I 5593).

53. After the audit for the 2005-2006 Prior Policy, contract drivers were not included in the audited premiums because AIG's auditor found that PDX "uses independent owner/operator individuals who are free to work for any one, not restricted under contract with insured, no reimbursement of expenses, paid by the load/mile, and have no helpers, not supervised, do not show insured[']s logo on their trucks. Contract reviewed." A true and correct copy of AIG Workers' Compensation Audit Worksheet for the 2005-2006 Prior Policy,

dated August 9, 2006, produced by AIG in this action and bearing Bates numbers C&I 5552 – C&I 5562, is attached hereto as Exhibit 9 (*see* C&I 5554).

54. After the audit for the 2006-2007 Prior Policy, contract drivers were not included in the audited premiums because AIG's auditor found that PDX "uses independent owner/operator individuals who are free to work for any one, not restricted under contract with insured, no reimbursement of expenses, paid by the load/mile, and have no helpers, not supervised, do not show insured [']s logo on their trucks. Contract reviewed." A true and correct copy of AIG Workers' Compensation Audit Worksheet for the 2006-2007 Prior Policy, dated May 21, 2007, produced in this action by AIG and bearing Bates numbers C&I 5599 – C&I 5613, is attached hereto as Exhibit 10 (*see* C&I 5602).

55. The contract drivers were not included in the audited premium for the 2007-2008 Prior Policy and 2008-2009 Prior Policy. True and correct copies of AIG Workers' Compensation Audit Worksheets for the 2007-2008 Prior Policy, dated May 27, 2008, and 2008-2009 Prior Policy, dated June 12, 2009 (produced in this action by AIG and bearing Bates numbers C&I 5576 – C&I 5590 and C&I 5632 – C&I 5647, respectively), are attached hereto as Exhibits 11 and 12, respectively.

56. After the audit for the 2009-2010 Prior Policy, contract drivers were not included in the audited premiums because AIG's auditor found that PDX uses "owner/op[erator]s, independent contractors, individuals who operate and maintain, pay for expenses of owned equipment with no direction / control by insured, work for others as well if desired, have no employees (determined as per independent contractor rule)." A true and correct copy of AIG Workers' Compensation Audit Worksheet for the 2009-2010 Prior Policy,

dated June 15, 2010, produced in this action by AIG and bearing Bates numbers C&I 5563 – C&I 5575, is attached here to as Exhibit 13 (*see* C&I 5565).

57. After the audit for the 2010-2011 Prior Policy, contract drivers were not included in the audited premiums because AIG's auditor found that PDX uses "owner/op[erator]s, independent contractors, individuals who operate and maintain, pay for expenses of owned equipment with no direction / control by insured, work for others as well if desired, have no employees (determined as per independent contractor rule)." A true and correct copy of AIG Workers' Compensation Audit Worksheet for the 2010-2011 Prior Policy, dated June 10, 2011, produced in this action by AIG and bearing Bates numbers C&I 5614 – C&I 5631 at C&I 5617, is attached hereto as Exhibit 14.

58. As the person responsible for purchasing workers' compensation insurance for PDX, I relied on the consistent results of AIG's audits of the Prior Polices in deciding to continue purchasing workers' compensation insurance with AIG. Over the course of the performance of the Prior Policies, I always understood that AIG recognized that the contract drivers are independent contractors and therefore should be excluded from the premium basis. There was no doubt in my mind that this was the parties' joint and common understanding of how contract drivers would be treated under AIG's policies. If AIG had ever suggested that it viewed contract drivers as employees or as otherwise subject to inclusion in the policies' premium basis, then PDX would have sought coverage elsewhere. Indeed, when it became clear that AIG would include the contract drivers in the premiums for the At-Issue Policies, PDX sought and obtained workers' compensation insurance for its employees through PEOPL*EASE*, a professional employer organization. Contract drivers continue to operate with their own occupational accident insurance.

**H. <u>The Audit of the At-Issue Policies (the "Audit")</u>**

59. For both of the At-Issue Policies, AIG excluded contract drivers from the estimated premiums, just like it had for all seven of the Prior Policies.

60. The Audit was first conducted by reviewing PDX books and records, including payroll records, and by interviewing me, as well as seeking information from PDX's insurance broker, Kramer-Warner Associates, Inc. By July 2013, it was clear from communication with AIG that AIG intended to include contract drivers in the premium basis for the At-Issue Policies, even though Kramer-Warner and I were adamant that contract drivers are independent contractors and provided documentation to that effect. Indeed, AIG had acknowledged the contract drivers as independent contractors for many years and the PDX business model had not changed. Accordingly, in July 2013, PDX retained Reed Smith LLP to represent PDX in further communications and proceedings respecting the premiums.

61. On July 26, 2013, PDX, via our counsel, submitted to AIG materials prepared by CMS and Kramer-Warner Associates, Inc. (PDX's insurance broker), including the form Independent Contractor Agreement (even though AIG had repeatedly reviewed the Agreement in connection the audits of the Prior Policies). A true and correct copy of the July 26, 2013 correspondence, and its enclosures, is attached hereto as Exhibit 15.

62. On July 27, 2013, AIG issued an audit worksheet for the 2011-2012 Policy, which indicated that AIG provisionally intended to include the contract drivers in the premium basis for the At-Issue Policies. In that audit worksheet, however, AIG acknowledged that if the drivers were shown to be independent contractors, they would be excluded from the premium. The document states:

> The technical services division further advises the audit should be processed adding the contract drivers based on 1/3 payments to (CMS), ***until such information is provided by our policy holder showing that contract drivers are independent***.

A true and correct copy of AIG Workers' Compensation Audit Worksheet for the 2011-2012 Policy, dated July 27, 2013, produced by Defendants in this action and bearing Bates numbers PDX0020817 – PDX0020835, is attached hereto as Exhibit 16 (*see* PDX0020822-23).

63. On September 10, 2013, in the audit worksheet for the 2012-2013 Policy, AIG again acknowledged that that if the contract drivers were shown to be independent contractors, they would be excluded from the premium basis:

> If at a later date, the policy holder can provide adequate records to support their position that the contract drivers are independent, the auditor stands ready to conduct a re-examination of the records. At this time the auditor recommends that ***the independent contractors*** be included for premium calculation purposes based on 1/3 payments made [to CMS], ***until information is provided by our policy holder showing that contract drivers are independent***.

A true and correct copy of AIG Workers' Compensation Audit Worksheet for the 2012-2013 Policy, dated September 10, 2013, produced by Defendants in this action and bearing Bates numbers PDX0020954 – PDX0020973, is attached hereto as Exhibit 17 (*see* PDX0020959).

64. On November 14, 2013, after analyzing unexecuted Independent Contractor Agreements under Pennsylvania, New Jersey, and Florida law, AIG concluded that the contract drivers were most likely independent contractors but that its auditor needed executed agreements. AIG stated that:

> Based on the auditor's analysis of the of the unexecuted copies of the provided contract forms, it appears that many of the identified contractual elements for the contract drivers would fall within the meaning of state law within the states of Pennsylvania, New Jersey and Florida, showing that the drivers are independent drivers. However, the auditor does not have copies of properly executed contracts for this re-open request and therefore, may not recommend making any revisions to remove the contract driver exposure at this time. As a result, we have determined that the audit will not be revised.

A true and correct copy of the AIG's November 14, 2013 letter is attached hereto as Exhibit 18.

65. On December 17, 2013, in-house counsel for AIG's Underwriting Division requested additional documents from PDX, including a sampling of executed Independent Contractor Agreements and "[i]nvoices issued by the drivers at issue to PDX," in order to evaluate whether the drivers were independent contractors. A true and correct copy of the AIG's December 17, 2013 letter is attached hereto as Exhibit 19.

66. On January 9, 2014, PDX, via counsel, responded to AIG's letter of December 17, 2013, providing additional information about its operations and additional documentation confirming contract drivers are independent contractors, including a sampling of executed Independent Contactor Agreements. PDX also explained that "the drivers do not issue invoices to PDX. Rather, PDX keeps track of the drivers, sites, and projects, which essentially serves as the drivers' invoices. . . . Included . . . are some examples of how PDX keeps track of this information." A true and correct copy of this correspondence produced by PDX in this action and bearing Bates numbers PDX0021003 – PDX0021162, is attached hereto as Exhibit 20.

67. AIG's in-house counsel then conducted a "re-audit" of the At-Issue Polices. Despite the information we provided and their auditor's findings, AIG, via in-house counsel on May 7, 2014, denied PDX's request to remove contract drivers from the payroll used to calculate the workers' compensation premium. A true and correct copy of this May 7, 2014 correspondence produced in this action by AIG and bearing Bates numbers C&I 001 – C&I 041, is attached hereto as Exhibit 21.

I, Anthony Klondar, hereby submit this Affidavit under penalty of perjury and declare that the foregoing is true and correct to the best of my information, knowledge, and belief.

Anthony Klondar

Subscribed and sworn to before me

this 17 day of May, 2019.

Printed Name PATRICIA JONES

Commonwealth of Pennsylvania - Notary Seal
Patricia Jones, Notary Public
Delaware County
My commission expires July 2, 2020
Commission number 1080332
Member, Pennsylvania Association of Notaries